Philip SILBERT

v.

UNITED STATES of America.

Philip SILBERT

v.

UNITED STATES of America, Stephen
H. Sachs, United States Attorney, Paul
R. Kramer, Assistant United States At-
torney, and David Eagan, Acting Chief,
Intelligence Division, Internal Revenue
Service.

Julius SALSBURY

v.

UNITED STATES of America, Stephen H.
Sachs, United States Attorney, Paul R.
Kramer, Assistant United States Attor-
ney, Alan I. Baron, Assistant United
States Attorney, and David Eagan, Act-
ing Chief, Intelligence Division, Internal
Revenue Service.

Sigmund KASSAP aka John G. Doyle

v.

UNITED STATES of America, Stephen
H. Sachs, United States Attorney, and
David Eagan, Acting Chief, Intelligence
Division, Internal Revenue Service.

Jesse BONDROFF

v.

UNITED STATES of America, Stephen
H. Sachs, United States Attorney, and
David Eagan, Acting Chief, Intelligence
Division, Internal Revenue Service.

Misc. No. 564, Civ. Nos. 18874, 19174,
19209, 19210.

United States District Court
D. Maryland.
March 19, 1968.

See, also, D.C., 275 F.Supp. 765.

Norman P. Ramsey, H. Thomas Howell and Maurice T. Siegel, Baltimore, Md., for plaintiffs in Misc. No. 564 and Civ. No. 18874.

A. David Gomborov, David S. Harris and Louis Hoffman, Baltimore, Md., for plaintiff in Civ. No. 19174.

Arnold M. Weiner and Francis S. Brocato, Baltimore, Md., for plaintiffs in Civ. Nos. 19209 and 19210.

1. Hereinafter, Civil No. 18874 and Miscellaneous No. 564 are collectively referred to as *Silbert*, Civil No. 19174 is referred to as *Salsbury*, Civil No. 19209 is referred to as *Kassap*, and Civil No. 19210 is referred to as *Bondroff*.

2. See also Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968), filed the same day as *Marchetti* and *Grosso*, in which the Supreme Court held that Haynes' assertion of his Fifth

Stephen H. Sachs, U. S. Atty., Paul R. Kramer, Asst. U. S. Atty., and Alan I. Baron, Asst. U. S. Atty., for defendants in all cases.

**FRANK A. KAUFMAN**, District Judge.

These four cases [1] present pre-indictment questions raised by the recent decisions of the Supreme Court in Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (January 29, 1968) and Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (January 29, 1968). A brief review of *Marchetti* and *Grosso* is in order.[2]

Marchetti was convicted in the United States District Court for the District of Connecticut for violations of the federal wagering tax statutes. Specifically, Marchetti was found guilty of conspiring to evade the annual occupational tax imposed by 26 U.S.C. § 4411 and of wilfully failing to register before engaging in the business of accepting wagers as required by 26 U.S.C. § 4412. Marchetti, in his appeal to the Second Circuit, asserted, in part, that the statutory obligations of the federal wagering tax sections, under which he was indicted, violated his Fifth Amendment privilege against self-incrimination. The Second Circuit, 352 F.2d 848 (1965), rejected this contention and affirmed the conviction of Marchetti on the authority of United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953) and Lewis v. United States, 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475 (1955).[3] The Supreme Court granted certiorari to re-examine the Fifth Amendment questions posed by the "pertinent provisions of

Amendment privilege against self-incrimination provided a full defense to prosecutions for failure to register a firearm under 26 U.S.C. § 5841 and for possession of an unregistered firearm under 26 U.S.C. § 5851.

3. In *Kahriger* and *Lewis*, convictions based upon the federal wagering tax statutes were sustained, despite the assertion of the Fifth Amendment privilege by petitioners in those cases.

the wagering tax statutes," and to consider whether *Kahriger* and *Lewis* "still have vitality." 390 U.S. 39, 88 S.Ct. 697, 699, 19 L.Ed.2d 889.

In *Marchetti,* the Supreme Court reversed the judgment of the Second Circuit. Mr. Justice Harlan, for the majority of the Court, wrote that the federal wagering tax provisions

> * * * may not be employed to punish criminally those persons who have defended a failure to comply with their requirements with a proper assertion of the privilege against self-incrimination. [88 S.Ct. at 699].

The Court reviewed the federal wagering tax statutes, of which the provisions challenged by *Marchetti* are a part. One of such statutes referred to by the Court requires the principal internal revenue offices to maintain lists of those who have paid the occupational tax and to give "certified copies of the listing upon request to any state or local prosecuting officer," 26 U.S.C. § 6107. Another such statute provides that "payment of the wagering tax is not to 'exempt any person from any penalty provided by a law of the United States or of any State for engaging' in any taxable activity." 26 U.S.C. § 4422. 88 S.Ct. at 700.

Mr. Justice Harlan, in *Marchetti,* mentioned the provisions of 18 U.S.C., §§ 1084, 1952, 1301–04, and 1953, which impose federal criminal penalties for certain wagering activities and conduct related thereto. He also summarized the "more comprehensive" state and local wagering enactments and noted:

> * * * The laws of every State, except Nevada, include broad prohibitions against gambling, wagering, and associated activities.[4] [88 S.Ct. at 700 (footnotes omitted)].

Because Connecticut was the state in which Marchetti allegedly conducted his activities, Mr. Justice Harlan focused on Connecticut's penal scheme against gambling and wagering, and wrote:

> * * * By any standard, in Connecticut and throughout the United States, wagering is "an area permeated with criminal statutes," and those engaged in wagering are a group "inherently suspect of criminal activities." [88 S. Ct. at 702].

Analyzing the relationship of the federal wagering tax scheme to federal and state prohibitions directed at *gambling* and wagering activities, the Justice stated:

> Information obtained as a consequence of the federal wagering tax laws is readily available to assist the efforts of state and federal authorities to enforce these penalties. * * * Evidence of the possession of a federal wagering tax stamp, or of payment of the wagering taxes, has often been admitted at trial in state and federal prosecutions for gambling offenses; such evidence has doubtless proved useful even more frequently to lead prosecuting authorities to other evidence upon which convictions have subsequently been obtained. [88 S.Ct. at 702 (footnotes omitted)].

Discussing the effect of this relationship on Marchetti, the opinion states:

> In these circumstances, it can scarcely be denied that the obligations to register and to pay the occupational tax created for petitioner "real and appreciable," and not merely "imaginary and unsubstantial," hazards of self-incrimination. * * * Petitioner was confronted by a comprehensive system of federal and state prohibitions against wagering activities; he was required, on pain of criminal prosecution, to provide information which he might reasonably suppose would be

4. In footnote 5 of the *Marchetti* opinion, there is a list of state statutes which "illustrate[s] the state gambling and wagering statutes under which one engaged in activities under the federal provisions at issue here might incur criminal penalties." 88 S.Ct. at 701. Included in that list of statutes is "Md.Ann.Code, Art. 27, § 237–242 (1967)."

available to prosecuting authorities, and which would surely provide a significant "link in the chain" of evidence tending to establish his guilt. Unlike the income tax return in question in United States v. Sullivan, 274 U.S. 259, [47 S.Ct. 607, 71 L.Ed. 1037,] every portion of these requirements had the direct and unmistakable consequence of incriminating petitioner; * * * [88 S.Ct. at 702 (footnotes omitted)].

With regard to *Kahriger* and *Lewis,* the Court concluded

that nothing in the Court's opinions in *Kahriger* and *Lewis now* suffices to preclude petitioner's assertion of the constitutional privilege as a defense to the indictments under which he was convicted. To this extent *Kahriger* and *Lewis* are overruled. [88 S.Ct. at 706 (Emphasis supplied)].

The Court also found that the "required records" doctrine, as stated in Shapiro v. United States, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948), was inapplicable to the *Marchetti* case. In addition, the Court refused

to permit continued enforcement of the registration and occupational tax provisions, * * * by shielding the privilege's claimants through the imposition of restrictions upon the use by federal and state authorities of information obtained as a consequence of compliance with the wagering tax requirements. It is suggested that these restrictions might be similar to those imposed by the Court in Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678.

* * * We do not, as we have said, doubt Congress' power to tax activities which are, wholly or in part, unlawful. Nor can it be doubted that the privilege against self-incrimination may not properly be asserted if other protection is granted which "is so broad as to have the same extent in scope and effect" as the privilege itself. Counselman v. Hitchcock, 142 U.S. 547, 585,

12 S.Ct. 195, 35 L.Ed. 1110. The Government's suggestion is thus in principle an attractive and apparently practical resolution of the difficult problem before us. * * * Nonetheless, we think that it would be entirely inappropriate in the circumstances here for the Court to impose such restrictions.

The terms of the wagering tax system make quite plain that Congress intended information obtained as a consequence of registration and payment of the occupational tax to be provided to interested prosecuting authorities. * * * This has evidently been the consistent practice of the Revenue Service. We must therefore assume that the imposition of use-restrictions would directly preclude effectuation of a significant element of Congress' purposes in adopting the wagering taxes. Moreover, the imposition of such restrictions would necessarily oblige state prosecuting authorities to establish in each case that their evidence was untainted by any connection with information obtained as a consequence of the wagering taxes; the federal requirements would thus be protected only at the cost of hampering, perhaps seriously, enforcement of state prohibitions against gambling. We cannot know how Congress would assess the competing demands of the federal treasury and of state gambling prohibitions; we are, however, entirely certain that the Constitution has entrusted to Congress, and not to this Court, the task of striking an appropriate balance among such values. We therefore must decide that it would be improper for the Court to impose restrictions of the kind urged by the United States. [88 S.Ct. at 707 (footnotes omitted)].

The Court concluded that Marchetti

* * * properly asserted the privilege against self-incrimination, and that his assertion should have provided a complete defense to this prosecution. This defense should have reached both the substantive counts for

failure to register and to pay the occupational tax, and the count for conspiracy to evade payment of the tax. We emphasize that we do not hold that these wagering tax provisions are as such constitutionally impermissible; we hold only that those who properly assert the constitutional privilege as to these provisions may not be criminally punished for failure to comply with their requirements. If, in different circumstances, a taxpayer is not confronted by substantial hazards of self-incrimination, or if he is otherwise outside the privilege's protection, nothing we decide today would shield him from the various penalties prescribed by the wagering tax statutes. [88 S. Ct. at 709].

Grosso was convicted in the United States District Court for the Western District of Pennsylvania for willful failure to pay the excise tax imposed on wagering by 26 U.S.C. § 4401, for willful failure to pay the special occupational tax imposed by 26 U.S.C. § 4411, and for conspiracy to defraud the United States by evading payment of both taxes. 18 U.S.C. § 371. Grosso contended at trial and on appeal that payment of the excise tax would have obliged him to incriminate himself in violation of the privilege against self-incrimination. The Court of Appeals for the Third Circuit affirmed Grosso's conviction. 358 F.2d 154 (1966).

The Supreme Court, again in an opinion by Mr. Justice Harlan, reversed the conviction. The Court focused on Grosso's contention that "payment of the wagering excise tax would have compelled him to incriminate himself." After referring to the summary in *Marchetti* of state and federal penalties imposed on wagering, the Court noted that Pennsylvania—where Grosso allegedly accepted wagers—has a comprehensive statutory system for punishment of gambling and related activities. The Court found that "these penalties, in combination with the federal statutes * * * place petitioner [Grosso] entirely within

'an area permeated with criminal statutes,' where he is 'inherently suspect of criminal activities.'" (88 S.Ct. at 712).

In addition to the observations made in *Marchetti* about the federal wagering tax regulatory system, the Court in *Grosso* made two "additional observations" which the Court felt were necessary "* * * in order to assess fully the hazards of self-incrimination created by the wagering excise tax. * * *" (88 S.Ct. at 712). First, the Court noted that Internal Revenue Service Form 730, which must be filed by those liable for payment of the excise tax, "evidence[s] in the most direct fashion," when submitted with the replies demanded by its questions, "the fact of the taxpayer's wagering activities." The Court stated that since this form accompanies payment of the tax, the obligation to pay the tax and file the form "must be considered inseparable for purposes of measuring the hazards of self-incrimination which might stem from payment of the excise tax." 88 S.Ct. at 712. Second, the Court noted that "there is no statutory instruction, as there is for the occupational tax, that state and local prosecuting officers be provided listings of those who have paid the excise tax. * * *" Nevertheless, the Court concluded that

> * * * those liable for payment of the excise tax reasonably may expect that information obtainable from its payment, or from submission of Form 730, will ultimately be proffered to state and federal prosecution officers. * * *

The Court further observed that Grosso

> * * * is obliged, on pain of criminal prosecution, to provide information which would readily incriminate him, and which he may reasonably expect would be provided to prosecuting authorities. These hazards of incrimination can only be characterized as "real and appreciable." [88 S.Ct. at 713].

The Court, in commenting on Grosso's failure to pay the occupational tax, and

on his alleged participation in a conspiracy to defraud the Government by evading payment of taxes in violation of 18 U.S.C. § 371, recognized that Grosso did not assert a claim of privilege with regard to counts based on those particular violations. Yet, the Court stated:

* * * Given the decisions of this Court in *Kahriger* and *Lewis*, supra, which were on the books at the time of petitioner's trial, and left untouched by Albertson v. SACB, * * * [382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965)], we are unable to view his failure to present this issue as an effective waiver of the constitutional privilege. [88 S.Ct. at 715].

With regard to the conspiracy count under 18 U.S.C. § 371, the Court accepted Grosso's contention that that "count raises questions identical with those presented by the substantive counts for failure to pay that tax" and concluded

* * * that a taxpayer may not be convicted of conspiracy to evade payment of the tax, if the constitutional privilege would properly prevent his conviction for willful failure to pay it. [88 S.Ct. at 715].

In each of the cases at bar,[5] searches and seizures took place pursuant to warrants[6] issued either by a Judge or a Commissioner of this Court. Those searches and seizures occurred prior to the time of filing of the *Marchetti* and *Grosso* opinions on January 29, 1968.[7] The warrants in each of these cases re-

5. See Note 1 supra.

6. The warrant in *Silbert* was signed by Chief Judge Thomsen of this Court and was dated October 22, 1967. That warrant stated, *inter alia*, that a special agent of the Internal Revenue Service had affied before Judge Thomsen that the agent had "reason to believe" that on certain designated premis-
    * * * there is now being concealed certain property, namely records, papers, writings, slips, currency, safes, books, newspapers, marking and writing material, and other gambling paraphernalia, which are being used in violation of the Federal Wagering Tax laws, namely, Sections 4411, 4412, 4901(a), 7203, 7262, and 7302, Title 26 (U.S.C.) and Sections 371 and 1952 Title 18 (U.S.C.).
    The warrant in *Salsbury* was signed by United States Commissioner Volkart and was dated January 29, 1968. That warrant stated, *inter alia*, that a special agent of the Internal Revenue Service had affied before Commissioner Volkart that the agent was "positive" that on certain designated premises
    * * * there is now being concealed certain property, namely records, papers, writings, slips, currency, and other gambling paraphernalia such as safes, books, newspapers, markings, and writing material, adding machines, adding machine tapes, books, bets slips, rundown sheets, recap sheets, bet records, records of gambling debts owed, names of bettors, records of payments which are being used in violation of the Federal Wagering Tax laws, namely, Sections 4411, 4412, 4901, 7203, 7262 and 7302, of Title 26, United States Code.
    The warrant in *Kassap* was signed by Commissioner Volkart and was dated May 4, 1967. That warrant stated, *inter alia*, that certain persons had affied before Commissioner Volkart that they had "reason to believe" that on certain designated premises
    * * * there is now being concealed certain property, namely gambling paraphernalia, together with records, writing, and correspondence relating to the ownership and use of same, which are being used as the means of committing violations of Sections 4411, 4901, 7203, 7262, and 7302, United States Internal Revenue Code of 1954.
    The warrant in *Bondroff* was in all material respects similar to the warrant in *Silbert* as described above in this footnote.

7. The following are the dates and times of the commencement of the specific seizures in each of these cases:
     (1) In *Silbert*, at 5:30 p.m. on October 23, 1967;
     (2) In *Salsbury*, at 12:15 a.m. on January 29, 1968;
     (3) In *Kassap*, at 1:30 p.m. on May 5, 1967; and
     (4) In *Bondroff*, at 5:05 p.m. on October 23, 1967.
The Supreme Court filed its decisions in *Marchetti* and *Grosso* on January 29, 1968, after the above times.

fer to 26 U.S.C. §§ 4411, 4901, 7203, 7302 and 7262. In addition, the warrants in all of these cases except *Kassap* refer to 26 U.S.C. § 4412, and the warrants in *Silbert* and *Bondroff* specifically mention 18 U.S.C. §§ 371 and 1952.[8]

**8.** 26 U.S.C. § 4411 provides as follows:

There shall be imposed a special tax of $50 per year to be paid by each person who is liable for tax under section 4401 or who is engaged in receiving wagers for or on behalf of any person so liable.

26 U.S.C. § 4401, the wagering excise tax provision, contains the following at subsection (c):

Each person who is engaged in the business of accepting wagers shall be liable for and shall pay the tax under this subchapter on all wagers placed with him. Each person who conducts any wagering pool or lottery shall be liable for and shall pay the tax under this subchapter on all wagers placed in such pool or lottery. Any person required to register under section 4412 who receives wagers for or on behalf of another person without having registered under section 4412 the name and place of residence of such other person shall be liable for and shall pay the tax under this subchapter on all such wagers received by him.

26 U.S.C. § 4412(a) provides as follows:

Each person required to pay a special tax under this subchapter [occupational tax] shall register with the official in charge of the internal revenue district—

(1) his name and place of residence;

(2) if he is liable for tax under subchapter A, [taxes on wagers] each place of business where the activity which makes him so liable is carried on, and the name and place of residence of each person who is engaged in receiving wagers for him or on his behalf; and

(3) if he is engaged in receiving wagers for or on behalf of any person liable for tax under subchapter A, the name and place of residence of each such person.

26 U.S.C. § 4901(a) and (c) (1) provide as follows:

(a) No person shall be engaged in or carry on any trade or business subject to the tax imposed by section 4411 (wagering), 4461(a) (1) (coin-operated gaming devices), 4721 (narcotic drugs), or 4751 (marihuana) until he has paid the special tax therefor.

(c) (1) All special taxes imposed by law shall be paid by stamps denoting the tax.

26 U.S.C. § 7203 provides as follows:

Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return (other than a return required under authority of section 6015 or section 6016), keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution.

26 U.S.C. § 7302 provides as follows:

It shall be unlawful to have or possess any property intended for use in violating the provisions of the internal revenue laws, or regulations prescribed under such laws, or which has been so used, and no property rights shall exist in any such property. A search warrant may issue as provided in chapter 205 of title 18 of the United States Code and the Federal Rules of Criminal Procedure for the seizure of such property. Nothing in this section shall in any manner limit or affect any criminal or forfeiture provision of the internal revenue laws, or of any other law. The seizure and forfeiture of any property under the provisions of this section and the disposition of such property subsequent to seizure and forfeiture, or the disposition of the proceeds from the sale of such property, shall be in accordance with existing laws or those hereafter in existence relating to seizures, forfeitures, and disposition of property or proceeds, for violation of the internal revenue laws.

Hereinafter, the above sections of Title 26 will be referred to as federal wagering tax provisions.

18 U.S.C. § 1952 (a) and (b) provide as follows:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

There are common problems posed by the relief requested in each of these cases. Briefly, plaintiffs seek the suppression and return of, and an injunction against the use of, evidence allegedly illegally obtained by the Government. Plaintiffs attack the validity of the respective searches and seizures, by means of which such evidence was obtained, alleging, *inter alia,* that the warrants were invalid and that the supporting affidavits did not disclose probable cause. In addition, plaintiffs contend that since the underlying basis for probable cause, if any, was their failure to register in compliance with the federal wagering tax laws, the warrants must be deemed defective under *Marchetti* and *Grosso.*

■ Before considering the principal questions in these cases there are two underlying general issues which require discussion. The first of those underlying issues relates to the fact that all of the plaintiffs seek pre-indictment relief, basing their requests in part on *Marchetti* and *Grosso,* and in part on other contentions. In Silbert v. United States, 275 F.Supp. 765 (1967), which was filed before the Supreme Court's decisions in *Marchetti* and *Grosso,* this Court held that pre-indictment relief should not be granted either under Federal Criminal Rule 41 or in an injunction proceeding, except in extraordinary circumstances. The Government concedes that certain questions presently raised in these cases should be determined in the pre-indictment period. This Court agrees with that position of the Government. In these cases, the doctrine of *Marchetti* and *Grosso,* and certain other considerations which are closely intertwined with that doctrine, thrust upon the Government and the private litigants pressing questions of an unusual nature. This Court, at the pre-indictment stage, will consider and determine such questions within the extraordinary circumstances exception set forth in Silbert v. United States, supra.

The second underlying issue relates to questions raised concerning the degree, if any, of retroactive application which this Court should give to *Marchetti* and *Grosso.* It is unnecessary to theorize in depth about the various possible degrees of prospectivity and retroactivity which could be afforded to the doctrines of *Marchetti* and *Grosso.* This Court is faced only with questions concerning the specific relief sought by plaintiffs and the prohibitions they desire to visit upon the Government as part and parcel of the obtention of that relief. And to that extent only will this opinion deal with questions of prospectivity and retroactivity.

In the light of *Marchetti* and *Grosso,* and the allegations stated and the relief requested in the cases at bar, the following principal questions require consideration herein:

I. Can any of the plaintiffs be prosecuted under the federal wagering tax

---

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this section "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics, or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.

18 U.S.C. § 371 provides as follows:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

statutes in view of their assertion of the Fifth Amendment privilege against self-incrimination?

II.   Can Silbert or Bondroff be prosecuted under 18 U.S.C. § 371 or 18 U.S.C. § 1952, and can the evidence obtained in the respective searches and seizures involving them be used in such prosecutions?

III.   Do *Marchetti* and *Grosso* require this Court to order the suppression or return of any evidence or property obtained in any of the respective searches and seizures in these cases?

### I.

■   The Government concedes that it may not prosecute any of the plaintiffs in these cases for violations of the federal wagering tax laws, in view of *Marchetti* and *Grosso,* and of plaintiffs' respective assertions of the Fifth Amendment privilege against self-incrimination.[9]   This Court agrees with that concession.   In the companion cases of Greenwood v. United States, 392 F.2d 558 Feb. 9, 1968) and Lunsford v. United States, 392 F.2d 558, Feb. 9, 1968) the Fourth Circuit held that a proper assertion of the Fifth Amendment privilege was a complete defense to prosecutions based on the wagering tax provisions. In those cases, the Fourth Circuit, applying *Marchetti* and *Grosso,* reversed the district court's convictions of Greenwood and Lunsford for alleged wagering tax

violations.   Originally, after oral argument in *Greenwood* and *Lunsford,* the Fourth Circuit had stayed further proceedings in those cases pending the decision of the Supreme Court of the United States in Costello v. United States, No. 41, October Term, 1966, and related cases, in which certiorari had been granted by the Supreme Court to examine the constitutionality of certain of the wagering tax provisions of 26 U.S.C.   Costello died before a decision in his case, and therefore, the Supreme Court decided to consider in *Marchetti* and *Grosso* the questions presented in *Costello.*[10]   Following the *Marchetti* and *Grosso* decisions, the Fourth Circuit reversed the convictions of Greenwood and Lunsford. Although nothing in the briefs filed by counsel with the Fourth Circuit, or in the Court's opinion, in *Greenwood* and *Lunsford,* suggests that the issue of retroactivity was raised or specifically considered in those cases, the Fourth Circuit gave the *Marchetti* and *Grosso* decisions a degree of retroactive effect by applying them to *Greenwood* and *Lunsford,* i. e., two cases involving convictions which were on appeal and were not yet final, at the time the decisions in *Marchetti* and *Grosso* were filed by the Supreme Court.   The Supreme Court has apparently given *Marchetti* and *Grosso* similar treatment in a series of orders issued by the Court during the preparation of this opinion.[11]

9.   Plaintiffs, whose gambling activities took place in Maryland, are faced with a "variety of measures for the punishment of gambling and wagering" in that state. 88 S.Ct. at 702.   For a list of those Maryland measures referred to by the Supreme Court in *Marchetti* see Note 4 supra.   See also Md.Code Ann. (1957 ed.) Art. 27, §§ 244, 246, 356, 358, 360, 361, 362, 365, 366, 367 and 368.

10.   On March 4, 1968, in a *per curiam* order, the Supreme Court noted the mootness of *Costello,* and vacated the judgment of the Second Circuit.   36 U.S. L.W. 3344, March 5, 1968.

11.   On March 4, 1968, the Supreme Court vacated the judgments of courts below in

a number of cases involving or related to the federal wagering tax laws.   See 36 U.S.L.W. 3338–39 and 3344.   In one of them, Rainwater v. Florida, 186 So.2d 278 (Fla.1966), certiorari was granted on that same day and *Marchetti* and *Grosso* were cited as authority for that grant and for the disposition of the case.   While *Marchetti* and *Grosso,* as far as United States Law Week discloses, were not cited in· the Orders, other than in *Rainwater,* they are rather clearly the bases for the Court's March 4, 1968 actions.   Those Orders are further evidence of the application by the Supreme Court of a degree of retroactive application of *Marchetti* and *Grosso* at least as great as that given by the Supreme Court in those opinions and by

This Court therefore holds that *Marchetti* and *Grosso, Greenwood* and *Lunsford,* and the Orders of the Supreme Court cited in Note 11, supra, preclude the Government from prosecuting plaintiffs for violation of the federal wagering tax laws in view of their respective assertions of the Fifth Amendment privilege.

## II.

■ The affidavits and warrants in *Silbert* and *Bondroff* refer not only to federal wagering tax law violations but also to violations of 18 U.S.C. § 371 and § 1952.[12] The latter section includes a prohibition against the use of interstate facilities to carry on gambling. Nothing in *Marchetti* and *Grosso* would appear to proscribe the prosecution of Silbert or Bondroff under 18 U.S.C. § 1952. Nor should the use of evidence in such prosecutions be suppressed because the affidavits and warrants in these cases refer

to violations of the federal wagering tax laws as well as to violations of §§ 1952 and 371 of 18 U.S.C. In United States v. Epstein, 240 F.Supp. 80 (S.D.N.Y.1965), in which, seemingly, there was a defective factual ground for probable cause stated in the affidavit supporting the warrant, but in which there were also sufficient factual allegations to sustain probable cause, the Court said (at 82):

> * * * There is authority, and none to the contrary, that when a warrant issues upon an affidavit containing both proper and improper grounds, and the proper grounds—considered alone —are more than sufficient to support a finding of probable cause, inclusion of the improper grounds does not vitiate the entire affidavit and invalidate the warrant.

See also Chin Kay v. United States, 311 F.2d 317, 321–322 (9th Cir. 1962); Clay v. United States, 246 F.2d 298, 304 (5th

---

the Fourth Circuit in *Greenwood* and *Lunsford.*

Such application gives *Marchetti* and *Grosso* a greater degree of retroactive application than that given (a) Escobedo v. State of Illinois, 378 U.S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964) and Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) by Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), in which *Escobedo* and *Miranda* were respectively applied only to cases in which trials commenced after the respective dates of the Supreme Court's opinions in those two cases; or (b) United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, (1967) by Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), in which *Wade* and *Gilbert* were made applicable only to cases in which offending line-ups occurred after the date of the Court's opinions in *Wade* and *Gilbert.* On the other hand, see Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966) and Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), making Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) and Mapp v. Ohio, 367 U.S. 643, 81 S.Ct.

1684, 6 L.Ed.2d 1081 (1965), respectively, applicable only to cases in which convictions were not final on the respective filing dates of *Griffin* and *Mapp.* Further see Zuckerman v. Greason, 386 U.S. 15, 87 S.Ct. 847, 17 L.Ed.2d 696 (1967) and Kaye v. Coordinating Committee, etc., 386 U.S. 17, 87 S.Ct. 848, 17 L.Ed.2d 698 (1967), which seemingly applied Spevak v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967) to cases in which the judgments were not final on the date the Supreme Court filed its opinion in *Spevak.*

12. Those Sections of 18 U.S.C. are set out at Note 8, supra. In *Grosso,* the Supreme Court concluded that a taxpayer may not· be convicted under 18 U.S.C. § 371 of conspiracy "to defraud the United States" based upon his failure to comply with the federal wagering tax laws, in the face of his exercise of his Fifth Amendment privilege. However, this does not necessarily mean that prosecution under 18 U.S.C. § 371 cannot be pursued for conspiracy to "commit any offense against the United States" other than an offense under the federal wagering tax laws. Thus, for instance, in *Silbert* and *Bondroff,* the charges under 18 U.S.C. § 371 may relate to the charges under 18 U.S.C. § 1952.

Cir. 1957), cert. denied, 355 U.S. 863, 78 S.Ct. 96, 2 L.Ed.2d 69 (1957); Shrout v. State, 238 Md. 170, 175, 208 A.2d 585, 588 (1964).

This Court concludes that the references to alleged federal wagering tax law violations in the *Silbert* and *Bondroff* affidavits and warrants does not prevent the use of evidence seized under those warrants in prosecutions under 18 U.S.C. § 1952, and under § 371 to the extent any such prosecution charges a conspiracy with regard to § 1952 and not with regard to the federal wagering tax law.

### III.

▮ The holding in II above, with regard to the evidence seized under the warrants in *Silbert* and *Bondroff*, temporarily supplies the answer to Question III for those cases. In view of the fact that the warrants in *Silbert* and *Bondroff* allege violations of 18 U.S.C. § 1952, this Court, at this time, will not suppress, or order the return of, any evidence seized in connection with the proceedings concerning Silbert and Bondroff. That determination in no way forecloses Silbert and Bondroff from hereafter making challenges on the ground that the warrants issued in their cases are not valid, for reasons not related to *Marchetti* and *Grosso*.[13]

The Government concedes the right of all of the plaintiffs in these cases to assert successfully the Fifth Amendment privilege against prosecutions for violations of the federal wagering tax laws. The Government does contend, however, that each of the four searches and seizures in these cases, having been completed prior to the filing of the opinions in *Marchetti* and *Grosso*, were legal, and that the fruits thereof may be utilized by

the Government as the Government wishes, other than in connection with proceedings under the wagering tax provisions of Title 26.

Plaintiffs contend that the Government was aware, before the raids in these cases, that *Marchetti* and *Grosso*, and other cases raising the issues posited in *Marchetti* and *Grosso*, were pending before the Supreme Court for a long period of time. Plaintiffs also note that the practice of this Court and certain other Federal District Courts has been to defer sentencing in many cases in which defendants have been found guilty under the federal wagering tax provisions until after the Supreme Court should have determined what were first thought of as *Costello* issues, and are now known as *Marchetti* and *Grosso* issues. Plaintiffs argue that since the Government knew before the commencement of the raids in each of the four cases at bar that *Marchetti* and *Grosso* were before the Supreme Court for decision, the Government proceeded with its eyes open and should now be judged on a relation-back basis as having conducted illegal and unconstitutional searches and seizures on the dates on which the occurrences took place in each of the four cases at bar.

Such a view seems completely unrealistic to this Court. When the Government conducted its searches and seizures in each of these four cases, it did so under the authority of *Kahriger* and *Lewis*. Those cases have now been undermined, if not entirely overruled, by *Marchetti* and *Grosso*. It seems clear, as the majority opinion states in Linkletter v. Walker, 381 U.S. 618, 623, 85 S.Ct. 1731, 14 L.Ed.2d 601 et seq. (1965), that under modern jurisprudence, there is frank recognition that courts do overrule

---

13. Silbert and Bondroff contend that they should be permitted to challenge at this time the probable cause basis of the warrants in their cases in connection with alleged violations of 18 U.S.C. §§ 1952 and 371. This question has not as yet been fully argued in these proceedings. This Court will afford to all counsel the opportunity promptly to present written and oral argument as to whether this question should be considered on the merits at this pre-indictment stage, and if so, whether or not the warrants have a sufficient 18 U.S.C. §§ 1952 or 371 probable cause basis.

opinions and that law does change. On this basis, this Court holds that *Kahriger* and *Lewis* stated the law at the time the searches and seizures took place in these four cases, and that those searches and seizures were therefore legally based on alleged violations of the federal wagering tax laws. There, thus, is no need here for the Court to penalize the Government in order to enforce a policy

> * * * to limit searches and seizures of those conducted in strict compliance with the commands of the Fourth Amendment. [United States v. Wallace & Tiernan Co., 336 U.S. 793, 796, 69 S.Ct. 824, 826, 93 L.Ed. 1042 (1949)].

A basic policy underlying the exclusionary rule aimed at protecting Fourth Amendment rights was stated by Mr. Justice Stewart in Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960) when he wrote:

> * * * The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.

This Court will not prohibit the use by the Government of evidence obtained pursuant to the warrants in these cases on the basis of Fourth Amendment policy, since, the searches and seizures here were * * * not the kind that has prompted this Court to hold that the Government by wrongful conduct of its officers forfeited all opportunity to make use of evidence unlawfully seized. We decline to extend the Silverthorne rule to such an extent. The Fourth Amendment, important as it is in our society does not call for imposition of judicial sanctions where enforcing officers have followed the law with such punctilious regard as they have here. * * * [14] (United States v. Wallace, supra, 336 U.S. at 799–800, 69 S.Ct. at 828).

Furthermore, this is not a case like Rea v. United States, 350 U.S. 215, 76 S.Ct. 292, 100 L.Ed. 233 (1956), in which the Supreme Court held that a federal agent could be enjoined from testifying in a state court about evidence unconstitutionally obtained and therefore previously suppressed in a federal court proceeding.[15]

■ In the cases here at bar, this Court, at this pre-indictment stage, holds, for the reasons above stated, that the searches and seizures did not, when they were made, violate the proscriptions of the Fourth Amendment or of Federal Criminal Rule 41. In view of the propriety of the Government's conduct with regard to the searches in these four cases, this Court reiterates that it will impose no order on the Government based on a policy which seeks to deter

---

14. United States v. Wallace & Tiernan Co., supra, was a civil anti-trust proceeding. Prior to the commencement of that civil case, the defendant had been indicted for criminal anti-trust activities. The Supreme Court thereafter handed down its opinion in Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946), and as a result thereof, the indictment against Wallace & Tiernan Co. was dismissed because women had been improperly excluded from the Grand Jury in that case. In the civil case the Supreme Court refused to suppress the use of the documents previously supplied to the Grand Jury before the decision in *Ballard*. Mr. Justice Black, speaking for a unanimous court, held that there had been no illegal obtention of the documents and that they could be employed as evidence in the civil case. Mr. Justice Black stressed the non-culpability of Government conduct prior to the *Ballard* decision.

15. In *Rea*, the Supreme Court exercised the federal supervisory power. In Linkletter v. Walker, supra, 381 U.S. at 632, 85 S.Ct. at 1739, the Supreme Court stated that *Rea*
> * * * held that a federal agent might be enjoined from transferring to state authorities evidence that he had seized on an illegal federal warrant, or testifying with regard to it in a state prosecution.

federal officials from conducting, or penalizes them for having illegally conducted, searches and seizures. However, the non-culpability of the Government in relation to the issues considered by the Court concerning the raids in these cases does not answer the questions raised herein in a Fifth Amendment context. The opinions in *Marchetti* and *Grosso* discuss policies unrelated to Government wrongdoing and lay great stress upon the fact that the federal wagering tax statutes and the Government's enforcement machinery in connection therewith not only create a federal statutory scheme, but also are keyed to aiding the states in connection with ascertaining and successfully prosecuting violations of comprehensive state and local wagering prohibitions. *Marchetti* and *Grosso* both emphasize that one of the principal bases for the doctrines therein enunciated is that a person who is subject to the wagering tax provisions of Title 26 must make a choice between Scylla and Charybdis, in determining whether to violate those provisions, or to incriminate himself under state law and perhaps other federal laws by complying with the federal wagering tax requirements. The Supreme Court stated, in *Marchetti* and *Grosso,* that the exercise of the Fifth Amendment privilege against self-incrimination may not be so encumbered and abridged.

Recognition of the emphasis placed by the Supreme Court in *Marchetti* and *Grosso* on the interrelationship of the federal wagering tax provisions and other state and federal gambling laws compels this Court to conclude that the items seized under the warrants in *Salsbury* and *Kassap* (those cases now before this Court in which the warrants rest solely on allegations of violations of the federal wagering tax provisions) must be suppressed and returned, unless a contrary result is required by the tax levy and contraband contentions advanced by the Government and discussed below. This conclusion does not rest on Fourth Amendment grounds. It is a result which rests on the realization that if the evidence obtained in such searches and seizures can now be used for prosecutions under federal statutes, other than the federal wagering tax laws, or turned over to the state authorities for utilization by them, then the assertions by Salsbury and Kassap of their Fifth Amendment privilege—although not rendered meaningless in view of the dropping of the federal cases against them under the wagering tax provisions—will surely provide Salisbury and Kassap with curtailed self-incrimination protection and limited constitutional comfort. If any other conclusion is reached, Salsbury and Kassap will still be confronted with Maryland, and possibly other federal, prosecutions which are based on evidence seized pursuant to warrants issued solely for alleged violations of the federal wagering tax provisions—evidence which could not have been obtained under such warrants if Salsbury and Kassap had not chosen to avoid incriminating themselves by failing to comply with the federal wagering tax law requirements.

The policies underlying the privilege against self-incrimination can be defeated if a person entitled to exercise that privilege " 'can be whipsawed into incriminating himself under both state and federal law even though' the constitutional privilege is applicable to each." Murphy v. Waterfront Comm. of New York Harbor, 378 U.S. 52, 55, 84 S.Ct. 1594, 1597, 12 L.Ed.2d 678 (1964), quoting from Knapp v. Schweitzer, 357 U.S. 371, 385, 78 S.Ct. 1302, 2 L.Ed.2d 1393 (1958), (dissenting opinion of Mr. Justice Black).

* * * This has become especially true in our age of "cooperative federalism," where the Federal and State Governments are wagering a united front against many types of criminal activity. [Murphy v. Waterfront Comm., supra, 378 U.S. at 55–56, 84 S.Ct. at 1597].

Thwarting the effect of a federal search and seizure in the federal courts, only to effectuate and breathe life and meaning into that search and seizure by permit-

ting the federal authorities to hand its fruits to the state authorities, or to use those fruits in federal proceedings for purposes for which they were not obtained, whittles down the benefits of the exercise of the Fifth Amendment privilege.

Were it not for the civil tax levy and contraband considerations discussed below, this Court would at this time order the suppression and return of the evidence seized in *Salsbury* and *Kassap* in order to save those plaintiffs from any effect of the searches and seizures in their cases "which makes assertion of their Fifth Amendment privilege 'costly'." Spevak v. Klein, 385 U.S. 511, 514–515, 87 S.Ct. 625, 628, 17 L.Ed.2d 574 (1967). See also Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); Griffin v. State of California, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965); Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); C. F. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886). Such an order would not only apply to the documents seized under the *Salsbury* and *Kassap* warrants, but would also apply to such copies of those documents as are in the possession of the Government. Goodman v. United States, 369 F.2d 166 (9th Cir. 1966). In *Goodman,* the Ninth Circuit cited Judge Learned Hand's conclusion in United States v. Kraus, 270 F. 578 (S.D.N.Y. 1921),

> \* \* \* that copies must be returned along with the originals if the Fourth Amendment is to mean anything \* \*. (Goodman v. United States, supra, 369 F.2d at 168).

In order for the Fifth Amendment rights of Salsbury and Kassap "to mean anything," this Court must adopt the same reasoning and treat all copies the same

as originals, insofar as the use of documents in a prosecution against the person from whom the originals of such documents were seized, is concerned.[16] The Court will, in any event, order that one copy of any document which the Government may be required to return in these cases, be placed, under seal, among the records of this Court so that such copy will be available for inspection by a tribunal in any subsequent state or federal proceeding in which a "taint" contention is raised, and, for such use in any such proceeding as shall then be deemed appropriate.

■ Each of the plaintiffs words his own prayer for relief in somewhat different language. But, in essence, this Court is asked, by all of the plaintiffs, to enjoin all federal officials *from utilizing in any way, directly or indirectly,*[17] any of the fruits of the searches and seizures which offend *Marchetti* and *Grosso* but were authorized by *Kahriger* and *Lewis.* The United States Attorney has represented in a Memorandum filed in these cases on March 1, 1968, that the Government

> \* \* \* has in its possession evidentiary and investigative matter relating to plaintiffs and claimants herein which is wholly independent of and in no way the product of any searches and seizures at issue here. The Government further represents that it has in its possession investigative and evidentiary matter which resulted from the searches and seizures in question. While all of the material in the Government's possession relates to what the Government alleges are illicit gambling activities, the material obtained from the searches and seizures is not merely duplicative of material in the Government's possession inde-

16. Whether the Government can or cannot make and retain copies of documents seized in the raids in these cases, for use against others, raises a question which has only been briefly alluded to in oral argument. This Court will af-

ford to all counsel the opportunity fully to argue that issue.

17. As, for instance, in discussions with state or local enforcement officials.

pendently of any search and seizure in question.

The determination in an actual trial, of whether a specific piece of evidence should be suppressed for Fifth Amendment reasons can be best made at the time when the tracing of proffered evidence to tainted roots can be achieved in the context of a specific factual situation.

To do more, at this stage of the proceedings, than order suppression and return of evidence in *Salsbury* and *Kassap,* would clearly penalize the federal government, which acted under *Kahriger* and *Lewis* before the authority of those cases was severely undercut by *Marchetti* and *Grosso.* These cases do not present situations like the one in Lord v. Kelley, 223 F.Supp. 684 (D.Mass.1963), in which a Government agent clearly disregarded the mandate of the Fourth Amendment.

If, in *Salsbury* or *Kassap,* the Federal Government is hereafter required by this Court to suppress and return evidence obtained in the searches and seizures in those cases, and if after such suppression and return, Salsbury or Kassap is prosecuted for violation of a federal or state statute other than the federal wagering tax laws, then the court in any such proceeding will have before it the question, if the defendant raises it, of whether any evidence presented at that time offends the Fifth Amendment rights of Salsbury or Kassap. This Court need not and should not attempt to answer that question at this time, or to provide any greater relief than the suppression and return discussed above.

The Government contends that at least some of the money and property which plaintiffs seek to have returned to them may be retained by the Government because it was obtained pursuant to valid civil tax levies. The Government also takes the position that certain of the money and property whose return is sought by plaintiffs is contraband. This Court does not presently have sufficient facts before it in connection with the Government's tax levy and contraband contentions to make any determinations in connection therewith. The Government, as the party raising the two questions, will be required to file one or more affidavits[18] setting forth the relevant facts in connection therewith. After such affidavits have been filed by the Government, the plaintiffs who are respectively affected by those affidavits will be given the opportunity to file reply affidavits. Thereafter, this Court will expect each of the parties in these cases to file further memoranda and to be heard orally in connection with the tax levy and contraband issues. Because the impact of *Marchetti* and *Grosso* may dictate, during the pre-indictment stage of these proceedings, the suppression and return of certain evidence in *Salisbury* and *Kassap* for the reasons discussed in this opinion, it is necessary, at this time, for this Court to consider the effect of the tax levy and contraband contentions advanced by the Government, on such suppression and return.

After the Supreme Court's opinions in *Marchetti* and *Grosso* were handed down, after Salsbury, Bondroff and Kassap instituted these proceedings, and after Silbert filed his motion to reconsider, the Government made certain representations concerning interim use and non-use by the Government of evidence obtained in the searches and seizures in these cases. Those undertakings were made a matter of record in these cases. All counsel are requested to confer immediately with the Court with regard to presentation of arguments on the questions which have been reserved in this opinion for subsequent determination, and also with regard to interim understandings of counsel or Orders of this Court concerning the use or non-use of evidence seized in the raids in these cases pending final resolution by this Court of those reserved questions.

18. Cf. Di Bella v. United States, 369 U.S. 121, 129 n. 9, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962).