**Wade Hampton TOWNSEND and Willie Earl Williams, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 16789.**

United States Court of Appeals Fifth Circuit.

March 18, 1958.

Ira J. Carter, Jr., Gainesville, Fla., Zach H. Douglas, Jacksonville, Fla., for appellants.

Joseph P. Manners, Asst. U. S. Atty., Harrold Carswell, U. S. Atty., Tallahassee, for appellee.

Before HUTCHESON, Chief Judge, and JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Townsend appeals from consecutive sentences aggregating seven years based upon jury verdict of guilty on all remaining counts divided into two main groups in the indictment: (1) for unlawfully failing to pay the wagering annual occupational tax, 26 U.S.C.A. §§ 4411, 7201 (counts 8 and 19); and (2) for (a) wilfully evading and defeating the payment of the excise tax of 10% on wagers, 26 U.S.C.A. §§ 4401, 7201, and (b) wilfully failing truthfully to account for and pay over these excise taxes, 26 U.S.C.A. § 7202. Both (a) and (b) covered periods November-December 1952 (counts 3, 4, 5, 6) and February-October 1955 (counts 9 to 18 and 20 to 27). Willie Earl Williams, tried by agreement with Townsend, was convicted on a separate two-count indictment for the felony of wilfully evading payment of the occupational stamp tax, 26 U.S.C. A. §§ 4411, 7201.

In Townsend's appeal, the only matter of substantial concern is the sufficiency of the evidence and admissibility of telling pieces of evidence obtained by a search of his home under a search warrant and from his person subsequent to his arrest, without warrant, after the search of the premises was concluded.

We avoid repetition and reduce much of the detail of this 400-page printed record if we discuss first the sufficiency of the evidence though logically this may appear to reverse the usual order.

After first reporting to the Internal Revenue in 1951 that he had withdrawn from the numbers business (whether it was then "Night House," "Cuba" or "Bolita" is not too clear), Townsend subsequently reported in September 1952 that he was once again engaged in it. Townsend obtained and paid the annual stamp occupation tax for the period ending June 30, 1953. His own wager book (Exhibit 3) seized in the raid and admitted by him to be such, showed the wagers received from September through December 1952. The exact amount of the total net wagers for September and October corresponded exactly with the amounts reported in each succeeding month on Form 730 when the excise tax computed on the statutory basis of 10% was remitted. However, there was categorical testimony by officers of the Internal Revenue responsible for the receipt and processing of current payment of gambler's excise tax that no excise tax returns or remittances were ever received covering the months of November and December 1952.

Townsend's defense here was not that no tax was due or no return was required. His defense was that it had been paid. The issue on these counts (3, 4, 5 and 6) was then reduced to simple terms: had Townsend paid the tax? There were many things the jury could take into account in resolving this controversy. There was, for example, the fact that there was no Form 730 (either the original on file at the Revenue Office or loose retained duplicate copies in the wager book, Exhibit 3) for these two months, although there was one for September and October 1952. Likewise, Townsend's own explanation of payment by check may have been thought most unimpressive. When, during the trial, the issue of payment of the tax for these two months came up, his story was that all of his books and records, including cancelled checks, had been turned over to a certified public accountant in Jacksonville sometime before the trial. He then testified that he was unsuccessful in his effort to secure their return since the accountant was at that time on a vacation which would last two more weeks. Since Townsend and his able counsel for the ten months prior to the trial knew, from the counts of the indictment that specified the precise amount of tax due for each of these two months, that this issue would be in the case, the jury was likewise entitled to determine whether this explanation squared with the truth.

On the other counts of this group (9 through 19 and 20 through 27), the evidence, if credited, was equally adequate. Each pair of these counts (e. g. 9 and 10) covered for each succeeding month beginning in February 1955 the charge that Townsend wilfully (a) attempted to evade and defeat payment and (b) failed to account for and pay over the specified tax of 10% on the net wagers for that given month. Each was based precisely on the total of the net wagers reflected in the book (Exhibit 7) seized in the search of Townsend's home, kept by him in his own handwriting and, by evidence from persons qualified as experts in the numbers business and a Pick-Up man who worked for Townsend during this period, established sufficiently as a collection sheet covering collections to be made from or payments to be made to various Sellers.

The Pick-Up man ("Bubba" Daniels), by personal knowledge gained from acting as Pick-Up man in effecting collection from and occasional payment to Sellers, and by the use of a carbon copy of the weekly sheet furnished to him by Townsend, was able to identify each of the Sellers who were listed by first or nicknames or cryptic, furtive symbols. In addition, to the positive testimony of the Pick-Up man that he was acting as such (also as a Seller) for Townsend, three of these Sellers with whom he dealt and who were listed and identified

in this collection sheet book (Exhibit 7) testified categorically that each was selling numbers during this time. Their testimony, the testimony of the Pick-Up man and the collection sheet book tied this sufficiently to Townsend.

And again, as in the case of the asserted failure to pay the excise tax for November-December 1952, a factor of great relevance to the jury was Townsend's own effort to explain, or explain away, both the record and these witnesses. All was centered in his contention that, in addition to his legitimate business operations of a laundry, dry cleaning, filling station and sometime watermelon producer, he was a bootlegger of Federal tax-paid liquor in this dry Florida county. He insisted that while these witnesses were "Sellers," they were selling liquor, not numbers. Likewise, the book (Exhibit 7) was a record not of numbers sales, but of liquor sales for which these people were entitled to commissions.

In assessing his explanation concerning the book, the jury had ample basis for an informed skepticism, if not complete distrust. The book itself was a sales record book with triplicate sheets of different colors presumably furnished by the oil company whose products were sold in his service station. Many sheets referred to liquor, but each such sheet listed the liquor by type, brand and quantity. Certain figures were used in the price or money column. However on the liquor sheets there were no cryptic references to names or persons or nicknames, nor any reference to "collect" or "pay" as was the case on the sheets positively identified by the expert and the Pick-Up man as numbers collection sheets. The jury could treat as equally implausible the awkward and clumsy effort of Townsend to demonstrate how the indicated "commissions" and "shortages" and "pay" entries could fit collections from these people for liquor sold. For example, "pay" in a sum of $531.10 to "Ida" was translated by Townsend, not as an item to be paid to the named Seller, but to be *collected* from her for

liquor delivered. This "Ida" was the same person identified as a Seller by Pick-Up man Daniels, and who, as Ida Lou Sparks testified that she was such a Seller. On the other hand, the numbers experts had testified that such entries indicated that that Seller had had "hits" and this sum represented the amount which Townsend had to furnish to the Pick-Up man to deliver to the Seller for payment to that Seller's lucky winners.

█ If the jury resolved this controversy that the Pick-Up man was a numbers, not a liquor, collection representative, that these were numbers, not liquor, Sellers, and the collection book (Exhibit 7) was a record of liquor sales and numbers sales separately kept, there was, as with the case of counts 3, 4, 5, 6, ample basis for the critical inference by the jury that the failure to account and pay the tax was a wilful evasion, The net wagers reflected by Exhibit 7 for the period February 1955 through October 1955 exceeded $35,000 and the 10% tax due was in excess of $3500.

Once that fact controversy was resolved against Townsend on these counts, the same facts empowered the jury to make a clean sweep as to the only remaining counts (8 and 19) for the wilful failure to pay the $50 annual wagering occupation stamp tax. Count 8 covered the tax year July 1, 1954-June 30, 1955, and Count 19 the year July 1, 1955-June 30, 1956. The period reflected by the book (Exhibit 7) February 1955 to October 1955 overlapped both of these years.

█ In assaying the contention that the search of his residence was illegal, we may assume, without deciding, that the evidence was of such a nature that the conviction could not stand were the fruits of it erroneously admitted for in our view the search was lawful. There is nothing to the contention that the warrant itself was inadequate because it did not state that the house was in the possession of Townsend and merely described the place to be searched as "the premises known as 1326 NW Third

Place, being the dwelling on the Northwest corner of the intersection of NW Third Place and NW 15th Terrace, Gainesville, Florida * * *." The supporting affidavit referred to in the warrant used the same description and the additional phrase "and such premises and dwelling being used and occupied by Wade H. Townsend, alias Hamp Townsend * * *." The warrant of search was directed solely to the premises and not to a person. The address specified was the correct address and street number of Townsend's residence. The warrant accurately identified and described it. The description was such as to enable the officer readily to find it. That is sufficient. Gandreau v. United States, 1 Cir., 300 F. 21, 24, 25; United States v. Borkowski, D.C.Ohio, 268 F. 408.

Nor is there anything to the contention that the supporting affidavit was insufficient. Two named Revenue Agents and the Acting Chief of Police, University of Florida, subscribed and swore to the specified facts in the affidavit. The affidavit is too lengthy to copy, but it may be fairly summarized. On specified dates in 1955 and in the spring (March and May) of 1956, the officers specified as to each of these times had Townsend's home under surveillance. These occasions were on Friday night and Saturday which, as experts, they knew was the period of intense activity by numbers Sellers and Pick-Up men in going to and from the location of the Banker. On these occasions the officers saw a number of automobiles drive up and stop near Townsend's residence, frequently the occupants were Negroes. These persons were observed to go into Townsend's home which was located in a neighborhood occupied solely by white persons, and in a few minutes the persons would come out and drive away. On one occasion the person was observed carrying a brown sack (the "hallmark of the calling," Carter v. United States, 5 Cir., 231 F.2d 232, 234) which, on examination, was found to contain numbers slips and papers. The specified agents knew that Townsend had once been engaged in the numbers racket for which he obtained a wagering occupation stamp tax, but at that time he had not applied for or obtained such a stamp, nor was he then making returns or paying the excise taxes that came due each succeeding month on the previous month's net wagers.

This affidavit was not, as claimed, the mere aggregation of beliefs, rumors and reports picked up by the affiants which led them to the belief that the specified crimes were being committed and that property used in connection therewith would be found on these premises. These were facts known and observed by those swearing to them. The only question then was whether the Commissioner could conclude that this deduction was a reasonable one. Concerning the search there of a private dwelling, we pointed out, Clay v. United States, 5 Cir., 246 F. 2d 298, 302, that " * * * in short * * * there is no hard and fast rule precisely pinpointing what should be said and done in applying for and issuing a search warrant or what facts must appear to justify an arrest and search without a warrant; that in each case the inquiry is, are the facts put forward to support the action impeached in any way and, if not, are they as a whole sufficient to support the view that the conclusion reached and the action taken in accordance with the rule were not unreasonable but reasonable."

Here the magistrate, not the officer hot in pursuit, cf. Clay v. United States, 5 Cir., 239 F.2d 196, weighed and determined this matter as a judicial officer. Johnson v. United States, 333 U.S. 10, 13, 68 S.Ct. 367, 92 L.Ed. 436, 440. The Commissioner was certainly justified in the inference that experienced officers, familiar with the mechanisms and ramifications of this invidious numbers racket believed that all of these activities on the premises of a man known to have been in this business reasonably indicated that the person was once again conducting it. We need not decide then whether, or to what extent, Grau v. United States, 287 U.S. 124, 53 S.Ct. 38, 77

L.Ed. 212, has been affected by Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879.

■■ Of course, the moment we conclude that the search was valid, what the officers found had a significance beyond the confirmation of their prior reasonable belief. The things found (Exhibit 7, the collection sheet books, unused numbers slip pads, some 20 numbers slips, and a separate collection sheet) showed, to these experienced officers familiar with Townsend's previous activities, either that the numbers business was then being carried on at these premises or had been within a short time previously, and that Townsend was in the thick of it. In either case, it was a misdemeaner being committed in the presence of the officers or reasonable grounds for believing that a felony had been committed. Either of these justified the arrest of Townsend as he came to his home while the officers were still there about three hours after the search began. The officers arrested Townsend without a warrant and then obtained from his person additional pieces of evidence—four slips identified as numbers collection records. This was incident to a lawful arrest and the search was valid. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653.

■ In this record, we cannot conclude that if there were error in the inadvertent, but momentary, display of photostatic reproductions of a summary exhibit (Government No. 10) to a few members of the jury, that it had any harmful effect, Fed.Rules Crim.Proc. rule 52(a), 18 U.S.C.A. The Government had prepared a tabulated summary on accounting work sheet paper showing by horizontal columns the date and the sums to be collected (or to be paid) from or to the various Sellers previously identified as Sellers together with the total for that period. The vertical columns were headed by the exact name, nickname, or cryptic symbol shown in Exhibit 7. From this the Court and jury could readily see the data, but only the data, shown on the many scattered sheets in Exhibit 7. Extra copies had been made so that each juror could see it while certain witnesses were testifying. No objection was made to its use. Within less than a minute's time and while copies were being handed to the jurors, defense counsel discovered that one vertical column was headed up "Pick-Up man," apparently across the top of all of the vertical columns there was a heading indicating "Sellers," and other headings such as amounts paid out, number of sales, gross sales, etc. These details were not in fact stated in Exhibit 7 and when this was called to the Court's attention, the Court, upon hurried inspection and conference, immediately withdrew all copies from the jury. The objectionable parts were cut out and again, without objection, the paper was reintroduced and displayed to the jury.

If overemphasis was given, it was due entirely to the manner in which it was labored by defense counsel. But we do not think that it had any effect at all. The column for "Pick-Up man," for example, reflected the name "Fred" and "Nat" both of whom testified and were positively identified as Pick-Up men who had worked for Townsend, and the names of the others were likewise identified positively as Sellers, both by name and activity. As to the headings about gross sales, etc., there had been extensive testimony by experts that in view of the way the numbers racket records are kept, the figures in Exhibit 7 and in the other exhibits were the equivalent of sales, amount paid out, and the like. The deleted headings did not then supply any new or added information to the jury. They were innocuous.

■ But when we come to Williams, the matter stands differently. There was evidence that at a prior time he had obtained and paid the annual occupation stamp tax, and that on several occasions during the surveillance he had been seen going into or out of Townsend's home. The evidence showed, however, that his mother-in-law had worked for the Townsends as a servant for over many years. Also, Bubba Daniels' testimony about Williams was most equivocal except to

467

identify him as the "W. Earl" in the collection sheet book (Exhibit 7). There was no testimony that he had accepted any wagers in the period July 1, 1954 to June 30, 1955 (Count 1) or July 1, 1955 to June 30, 1956 (Count 2). And assuming that the inference was permitted that sales had been made by him, there was insufficient evidence to show, as required for a felony conviction, the wilful, purposeful failure to pay the tax. Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418.

The result is that the cause as to Townsend is affirmed, but as to Williams it is reversed and remanded with directions to enter judgment of acquittal.