Philip SILBERT

v.

UNITED STATES of America.

Philip SILBERT

v.

UNITED STATES of America, Stephen H. Sachs, United States Attorney, Paul R. Kramer, Assistant United States Attorney, and David Eagan, Acting Chief, Intelligence Division, Internal Revenue Service.

Julius SALSBURY

v.

UNITED STATES of America, Stephen H. Sachs, United States Attorney, Paul R. Kramer, Assistant United States Attorney, Alan I. Baron, Assistant United States Attorney, and David Eagan, Acting Chief, Intelligence Division, Internal Revenue Service.

Sigmund KASSAP aka John G. Doyle

v.

UNITED STATES of America, Stephen H. Sachs, United States Attorney, and David Eagan, Acting Chief, Intelligence Division, Internal Revenue Service.

Jesse BONDROFF

v.

UNITED STATES of America, Stephen H. Sachs, United States Attorney, and David Eagan, Acting Chief, Intelligence Division, Internal Revenue Service.

UNITED STATES of America

v.

$71,604.91 IN U. S. CURRENCY, 132 Checks in the Total Amount of $10,743.-01 and One Clary Electric Adding Machine, Julius Salsbury, Intervening Claimant.

UNITED STATES of America

v.

$11,300 IN U. S. CURRENCY and One Smith Corona Adding Machine, Sigmund Kassap aka John G. Doyle, Intervening Claimant.

UNITED STATES of America

v.

$51,716.37 IN U. S. CURRENCY, $6,417.11 in Checks, One Victor Brown Adding Machine, Serial No. 1826–823, One Compto-Graph, Serial No. 700485 and One Torch & Tool Resistant Safe, TRTL–30, Burglary No. 14867, Spec UBI–Y–260 SMNA, Group U4 Cat No. 1–21616, Philip Silbert, Intervening Claimant.

UNITED STATES of America

v.

$10,107 IN U. S. CURRENCY, Philip Silbert, Intervening Claimant.

UNITED STATES of America

v.

$10,395.30 IN U. S. CURRENCY, $926.88 in Checks, One Remington-Rand Adding Machine, Model #41012, Ser. No. 150–563107; One Underwood-Olivetti Adding Machine, Ser. No. 716444 and One Underwood-Olivetti Adding Machine Model 600, Ser. No. 200421, Jesse Bondroff, Intervening Claimant.

Misc. No. 564; Civ. Nos. 18874, 19174, 19209, 19210, 19504, 19505, 19512 *, 19513 *, 19514.

United States District Court
D. Maryland.
Aug. 15, 1968.

---

* In Case No. 19512, the seizure took place at Silbert's home, 3406 Janellen Drive, Pikesville, Maryland, a suburb of Baltimore. Civil No. 19513 involves the search on the same date at Harold's Club in downtown Baltimore.

Norman P. Ramsey, H. Thomas Howell and Maurice T. Siegel, Baltimore, Md., for plaintiff Philip Silbert.

A. David Gomborov, David S. Harris and Louis Hoffman, Baltimore, Md., for the United States and for intervening claimant Julius Salsbury.

Arnold M. Weiner and Francis S. Brocato, Baltimore, Md., for the United States and for intervening claimants Sigmund Kassap and Jesse Bondroff.

Stephen H. Sachs, U.S. Atty., Paul R. Kramer, and Alan I. Baron, Asst. U.S. Attys., for the United States, and for plaintiffs in Civ. Nos. 19504, 19505, 19512, 19513 and 19514.

FRANK A. KAUFMAN, District Judge.

Each of these cases presents issues which relate to the Supreme Court's decisions in Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and in Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968) and to this Court's earlier opinion in certain of these cases. 282 F.Supp. 635 (D.Md.1968).[1] In that earlier opinion this Court reserved three issues each of which is considered in this opinion.

1. Did probable cause exist for the issuance of the warrants in *Silbert* and

---

[1] Misc. No. 564 and Civ. Nos. 18874, 19174, 19209 and 19210. This Court's said earlier decision in those cases is hereinafter cited as Silbert, et al. v. United States.

*Bondroff* in connection with alleged violations of 18 U.S.C. § 1952, and also in connection with alleged violations of 18 U.S.C. § 371, insofar as the latter may relate to the charges under 18 U.S.C. § 1952?

■ This Court will consider that question, on the merits, within the extraordinary circumstances exception set forth in Silbert v. United States, 275 F. Supp. 765, 766 (D.Md.1967). See Silbert, et al. v. United States, 282 F.Supp., supra, at 642, 645, n. 13. An examination of the affidavits and warrants in *Silbert* and *Bondroff* reveals that those warrants were issued by Chief Judge Thomsen of this Court in a pre-*Marchetti-Grosso* setting, and with regard to alleged violations of the Federal Wagering Tax laws, and 18 U.S.C. §§ 1952 and 371.[2] The *Silbert* and *Bondroff* affidavits, presented to Judge Thomsen, on October 22, 1967, related almost entirely to the federal wagering tax laws and only in a tag-end way to 18 U.S.C. § 1952. Given *Marchetti* and *Grosso* and this Court's holding in Silbert, et al. v. United States, 282 F. Supp. supra, at 644, precluding prosecution of Silbert and Bondroff "for violation of the federal wagering tax laws in view of their respective assertions of the Fifth Amendment privilege," neither the *Silbert* nor the *Bondroff* warrants can survive the probable cause test with respect to prosecution under 18 U.S.C. § 1952 alone, or under that Section and 18 U.S.C. § 371 taken together.[3] 18 U.S.C. § 1952 involves the use of interstate or foreign facilities. There are telephone calls referred to in both the *Silbert* and *Bondroff* affidavits. However, they could have been local as well as interstate calls. The interstate facts are far too speculative to support probable cause for the issuance of warrants solely on the basis of alleged Section 1952 violations. The affidavits are not specific as to the mode of interstate facilities used, the manner by which such use facilitated gambling, and many other relevant details. Judge Thomsen acted on affidavits which were grounded on the assumption of the application of *Kahriger* and *Lewis*,[4] that is, in a *pre*, not a post, *Marchetti-Grosso* atmosphere. The references in the *Silbert* and *Bondroff* affidavits and warrants to Section 1952 were clearly not framed to rest entirely on their own bottoms, but rather were clearly underpinned and supported by the extensive allegations of federal wagering tax law violations. That underpinning and support has since been destroyed by *Marchetti* and *Grosso,* leaving insufficient foundation for the Section 1952 (and related Section 371) alleged violations. Therefore, this Court orders that the Government may not use, or permit the use, directly or indirectly, of any evidence seized pursuant to the warrants in *Silbert,* in any federal or state prosecution of Silbert; and may not use, or permit the use, directly or indirectly, of any evidence seized pursuant to the warrant in *Bondroff,* in any federal or state prosecution of Bondroff.

2. Shall the Government be permitted to retain copies of seized documents for use against persons other than the person from whom such documents were seized?

■ This Court has earlier held, citing Goodman v. United States, 369 F.2d 166, 168 (9th Cir. 1966), that copies of all documents seized in the cases considered in 282 F.Supp. 635, supra, will be treated exactly the same as the originals of such documents, insofar as the person from whom any such originals were seized is concerned. But in that case, this Court left open for further argument and for later determination, the question of whether the Government should be permitted to make and retain copies of such documents *for use against persons other* than the person from whom the documents were seized. 282 F.Supp. supra, at 648 n. 16. It is contended that if the

---

2. Those statutes are set forth in full at 282 F.Supp., supra, 641–642, n. 8.

3. With regard to 18 U.S.C. § 371, see 282 F.Supp., supra, at 644, n. 12.

4. United States v. Kahriger, 345 U.S. 22, 73 S.Ct. 510, 97 L.Ed. 754 (1953) and Lewis v. United States, 348 U.S. 419, 75 S.Ct. 415, 99 L.Ed. 475 (1955).

Government is permitted to use the fruits of the searches and seizures which offend *Marchetti* and *Grosso*, either against the person from whom such fruits were obtained, or against any third person or persons, the exercise of the Fifth Amendment privilege against self-incrimination by the person from whom the documents have been seized will be overburdened. It is said that the use of such copies against relatives, friends or associates of the person exercising the privilege will curtail the freedom which must surround that privilege. But the privilege, being personal, should not, in the judgment of this Court, be extended to enable, by its exercise, the person exercising it to be free of other than penalties to himself, or to protect anyone other than himself from prosecution—and this Court will not in these cases so extend it.

In Goodman v. United States, 369 F.2d 166, 168 (9th Cir. 1966), in which Judge Learned Hand's holding in United States v. Kraus, 270 F. 578 (S.D.N.Y.1921), was cited, it was alleged by the private litigant (at 167) that the government agents had obtained certain records by "a scheme of fraud and deception." No such allegations are made in any of these cases. Further, the question of retention of copies was approached in *Goodman* with regard to use against the aggrieved person whose Fourth Amendment rights had been offended—not, as in these cases, in connection with possible use against third persons.

In *Bondroff* and *Kassap*, no contention is made that the searches and seizures for alleged violations of the Federal Wagering Tax laws were violative of any constitutional rights, absent the decisions in *Marchetti* and *Grosso*, and while their predecessors, *Kahriger* and *Lewis*, held sway. In *Bondroff* and *Kassap*, as this Court held in Silbert et al. v. United States, supra, only Fifth Amendment challenges have been advanced. In *Salsbury* and *Silbert*, on the other hand, there are additionally what might be termed "pure" Fourth Amendment attacks, unrelated to *Marchetti-Grosso* or *Kahriger-*

*Lewis*. Because those Fourth Amendment challenges may affect the issue of whether copies of documents seized in the *Salsbury* and *Silbert* raids can be retained by the Government and used against persons other than the person from whom they were seized, this Court will deal at this time with those Fourth Amendment attacks within the extraordinary circumstances exception reserved in Silbert v. United States, 275 F.Supp. 765, supra.

A careful review of the *Salsbury* affidavit and warrant is all that is necessary to reject the "pure" Fourth Amendment attack in that case. Therein, the probable cause test is clearly met. In *Silbert*, no "pure" Fourth Amendment challenge is directed toward the search at Harold's Club. However, in *Silbert*, a substantial question is presented as to whether there was probable cause for the issuance of the warrant to search Silbert's home on Janellen Drive, in a suburb of Baltimore.

On October 23, 1967, Judge Thomsen issued two separate warrants to search Silbert's home at 3406 Janellen Drive, in Pikesville, and to search his business premises at Harold's Club in downtown Baltimore for "records, papers, writings, slips, currency, books, newspapers, marking and writing material, and other gambling paraphernalia." The Janellen Drive warrant also authorized a search for "safes." Those two warrants were based on the twenty-nine page affidavit of Special Internal Revenue Service Agent Martin. The *Silbert* affidavits disclose that that Government agent affied to facts which reveal a very careful surveillance of Silbert's gambling activities over a period of approximately five months. However, all such surveillance took place in downtown Baltimore except for one instance at Silbert's home on October 18, 1967, at which time Silbert was observed to drive up to his residence in a family automobile, to reach into his car and take out "two newspapers and a large brown paper bag, which appeared filled and light in weight," and to carry those articles "in one hand" into his home. In Carter v. United States, 231 F.2d 232,

234 (5th Cir. 1956), Judge Brown commented:

> * * * While the search, under a search warrant, was in progress, several persons were arrested as they came into the Club possessing brown paper sacks which were found to contain money and lottery tickets. The driver of an automobile arriving shortly before Carter's likewise had in his possession the hallmark of the [gambling] calling—the brown paper sack. * * *

At 231 F.2d, supra, 234 n. 2, Judge Brown noted that, "as anticipated, it [the paper sack] contained money and lottery tickets." See also references to brown bags in United States v. Whiting, 311 F.2d 191, 194 (4th Cir. 1962), cert. denied 372 U.S. 935, 83 S.Ct. 882, 9 L.Ed.2d 766 (1963), and Townsend v. United States, 253 F.2d 461, 465 (5th Cir. 1958). There are about a dozen references to brown bags in the affidavit in *Silbert*. Its presence in Silbert's hand on Janellen Drive created a substantial connecting rod between the downtown activities of himself and of his alleged employee, William Schreck, and his activities at home.

The affidavits in *Silbert* and *Bondroff* (and also in *Schreck*, see infra) each contain the following statement:

> * * * In this affidavit whenever it is averred that a brown paper bag or envelope was carried or passed by a subject under surveillance such bag or envelope, unless otherwise stipulated, was always of the size and shape normally used by bookmakers in this area to conceal and transport wagering records and money.

The search warrants in *Silbert* and *Bondroff* were signed by Chief Judge Thomsen the same day (October 23, 1963). On that day Judge Thomsen also issued a warrant to search the residence of William Schreck in Baltimore County. The affidavit which appears in the file in Schreck v. United States, Civil No. 19577, was made by Agent Martin on the same day he made the affidavits in Silbert and Bondroff, namely, October 22, 1967. Many of the pages in the affidavits in *Silbert*, in *Bondroff*, and in *Schreck*, are identical. They all reflect the same careful surveillance during the same period. Each of them, standing alone, and all of them read together, disclose that Silbert was the "boss."

In *Schreck*, the affidavit discloses that Schreck, on October 10, 1967, entered a downtown Baltimore bar and said to a female named Dolores: "Come on give it to me. I have to go to Pikesville." The affidavit continues: "It is noted that Philip 'Pacey' Silbert lives in Pikesville. Dolores then took a rolled-up brown paper bag from the drawer beneath the cash register and handed it to Wimple", a name by which Schreck was called.

■ " * * * It is elementary that in passing on the validity of a warrant, the reviewing court may consider *only* information brought to the magistrate's attention. * * * " Aguilar v. State of Texas, 378 U.S. 108, 109, 84 S.Ct. 1509, 1511, 12 L.Ed.2d 723 n. 1 (1964). However, the question of whether the facts in the *Schreck* affidavit can be considered in ruling upon the validity of the warrant issued in *Silbert* appears to be a somewhat novel one. The basis of the "four corners" doctrine is that the action of a judicial officer in executing a warrant must be viewed and weighed in the light of what was disclosed to that officer in the supporting affidavit. When Judge Thomsen signed the *Silbert* warrant, he had before him the *Schreck* as well as the *Silbert* and *Bondroff* affidavits. Because Judge Thomsen was thus informed on the same day, of Schreck's going-to-Pikesville comment, as well as of the Janellen Drive surveillance, this Court believes that the Schreck going-to-Pikesville comment can probably properly be taken into account by it in weighing the validity of the *Silbert* warrant. Such cumulation, however, would add only a bit of circumstantial weight in view of the lack of any mention of Silbert's name, or of the address on Janellen Drive, in Schreck's comment. But even without that added bit of support, and thus even if the Schreck comment is completely disregarded, this

Court holds that there was probable cause for the issuance of the warrant to search Janellen Drive. It is clear that observance of gambling activities at a man's place of business does not permit a warrant to issue to search his home. A number of cases have so held. Without either comparing or contrasting one or more of such cases, this Court believes that in *Silbert* there was sufficient connection between the downtown surveillance and the surveillance of the residence of the "boss" to constitute probable cause to search the latter for the items specified. To this Court, it seems unreasonable and impractical to say that there was any absence of probable cause after Silbert's activities downtown were as carefully noted and recorded, over a period of months, as they were in this case, and after Silbert was observed leaving the automobile and entering his home with a brown bag, "the hallmark" of his trade. This Court does not believe that such a basis was lacking because Silbert was only observed once entering his home with a brown bag, and because the agents did not thereupon risk themselves being observed, and continue their Janellen Drive surveillance for a further period of time after the single Janellen Drive occurrence.

In United States v. Ventresca, 380 U.S. 102, 107–109, 85 S.Ct. 741, 745–746, 13 L.Ed.2d 684 (1965), Mr. Justice Goldberg wrote:

> While a warrant may issue only upon a finding, of "probable cause," this Court has long held that "the term 'probable cause' * * * means less than evidence which would justify condemnation," Locke v. United States, 7 Cranch 339, 348, 3 L.Ed. 364, [367,] and that a finding of "probable cause" may rest upon evidence which is not legally competent in a criminal trial. Draper v. United States, 358 U.S. 307, 311, 79 S.Ct. 329, 332, 3 L.Ed.2d 327, [331]. As the Court stated in Brinegar v. United States, 338 U.S. 160, 173, 69 S.Ct. 1302, 1309, 93 L.Ed. 1879, [1889,] "There is a large difference between the two things to be proved

[guilt and probable cause], as well as between the tribunals which determine them, and therefore a like difference in the quanta and modes of proof required to establish them." Thus hearsay may be the basis for issuance of the warrant "so long as there * * * [is] a substantial basis for crediting the hearsay." Jones v. United States, supra, 362 U.S., [257] at 272, 80 S.Ct. [725 at] 736, [4 L.Ed.2d 697 at 708, 78 A.L.R.2d 233]. And, in Aguilar we recognized that "an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant," so long as the magistrate is "informed of some of the underlying circumstances" supporting the affiant's conclusions and his belief that any informant involved "whose identity need not be disclosed * * * was 'credible' or his information 'reliable.'" Aguilar v. State of Texas, supra, 378 U.S., at 114, 84 S.Ct., at 1514, [12 L.Ed.2d at 729].

These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

This is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the "underlying cir-

cumstances" upon which that belief is based. See Aguilar v. State of Texas, supra. Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. Jones v. United States, supra, 362 U.S., at 270, 80 S.Ct., at 735 [4 L.Ed.2d at 707, 78 A.L.R.2d 233].

This Court concludes that the *Salsbury* and the Janellen Drive (*Silbert*) warrants are valid.

If, however, this Court should be in error in sustaining the validity of the warrants in either *Salsbury* or *Silbert,* and if, therefore, there was in either such case a violation of Fourth Amendment rights to be secure against unreasonable search and seizure, there still remains the question of whether Salsbury or Silbert should be able to prevent the retention and use by the Government, against other persons, of copies of documents wrongfully seized from him.[5]

In United States v. Bozza, 365 F.2d 206 (2d Cir. 1966) and in United States v. Granello, 365 F.2d 990 (2d Cir. 1966), Judge Friendly rejected assertions by defendants that evidence, seized from third persons in violation of the Fourth Amendment's prescriptions concerning search and seizure, should be excluded. Judge Friendly wrote as follows in *Granello* (at 996):

We need not reiterate what we have recently said as to standing in United States v. Bozza, 365 F.2d 206, 222–223 (2 Cir. 1966), or repeat the citation of the authorities there assembled. Granello and Levine have not shown that any of the papers held to have been unlawfully seized from Birrell were theirs; he stood toward them not as a partner but as a buyer. If Birrell had regained the seized records before their trial, these would have been subject to subpoena for a purpose not prejudicial to him. Defendants are mistaken in their reliance on the statement in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319, 24 A.L.R. 1426 (1920), "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all"; Mr. Justice Holmes was speaking of an effort to require owners of records illegally seized by the Government to produce them after their return pursuant to a subpoena prepared from copies made during the illegal possession. Defendants' complaint is simply that the Government's awareness of their crime and its knowledge of how to establish it were fruits of a seizure that has been found at *nisi prius* to be illegal as against someone else. Sustaining this position would mean that if an illegal seizure of one man's records revealed a plot by others to kill a high public official or to overthrow the Government, the Fourth Amendment would prevent use of the records against

5. The argument is made that Rule 41(e) of the Federal Rules of Criminal Procedure requires this Court to grant the motion to suppress *and* return *in toto* and without qualification, if there has been a Fourth Amendment violation; and that that Rule gives no choice to this Court with regard to any retention or use by the Government of any copies of any documents seized in violation of Fourth Amendment rights. In view of the conclusion stated infra, in the body of this opinion, this Court finds it unnecessary to express any opinion in connection with that argument.

the plotters. We cannot believe the founders meant to go so far; it suffices that the seized property and its fruits should be sterilized as against the victims of the unlawful action. See Jones v. United States, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697, 78 A.L.R.2d 233 (1960).

While warrants were obtained in both *Salsbury* and *Silbert,* and while neither case presents an instance of anything approaching callous disregard of Fourth Amendment rights as in Smith v. Katzenbach, 122 U.S.App.D.C. 113, 351 F.2d 810, 815 n. 5 (D.C.Cir.1965); Austin v. United States, 353 F.2d 512 (4th Cir. 1962); In re Fried, 161 F.2d 453, 458–459 (2d Cir. 1947), and Lord v. Kelley, 223 F.Supp. 684 (D.Mass.1963), still either Salsbury or Silbert, if his Fourth Amendment rights were violated, would seem to require, if only in terms of protection of his own privacy, the right to prevent any retention for any purpose or any use against anyone of copies of documents wrongfully seized from him. The activities of the Government agents in *Salsbury* and *Silbert* clearly are not of the kind which require limitation to deter future Governmental violations of essential private rights. But, nevertheless, as individuals, Salsbury or Silbert, if his Fourth Amendment rights have been violated, should seemingly have the right to say: The documents belong to me; the Government wrongfully seized them; the Government must return them to me; no copies may be used or retained by the Government for any purpose; and the *status quo ante* must be restored. However, the above analysis has no application in any of these cases if this Court is correct in concluding that no Fourth Amendment rights of any of the private litigants have been violated.

■ This Court holds that the Government may retain and use against persons other than the person from whom the originals of the documents were seized, copies of the documents seized in *Silbert* and *Salsbury* because (1) the exercise by each of them of his own personal Fifth Amendment privilege against self-incrimination is not thereby overburdened; (2) there is no attack made in *Kassap* or in *Bondroff* with regard to the lack of existence of probable cause for the issuance of the warrants; and (3) the warrants in *Salsbury* and *Silbert* were, in this Court's opinion, validly issued.

In Silbert et al. v. United States, 282 F.Supp. supra, at 648, this Court required the Government to place under seal among the records of this Court a copy of any document ordered to be returned. In addition, this Court hereby requires the Government to keep a record or a log of the use made of the copy of any document seized in these cases, so that if a person, from whom any such document was seized in violation of his Fifth Amendment rights, contends in any future proceeding that the copy of any such document which this Court is permitting the Government to retain for possible use only against others, is being used against him, the Court to whom such a contention is addressed will be able to call upon the Government to produce such record or log.

3. Can the Government retain any of the property seized from Salsbury, Silbert, Kassap or Bondroff under the forfeiture provisions of 26 U.S.C. § 7302, or as contraband *per se,* or as property which has been subjected to assessment and levy by the Government?

The answer to this last question was left open in Silbert et al. v. United States, 282 F.Supp. supra, at 649. All parties in the cases which are covered by this opinion have informed this Court that they have completed their respective factual and legal presentations.[6] 26 U.S.C. § 7302 provides in pertinent part:

It shall be unlawful to have or possess any property intended for use in

---

6. The Government originally asserted counterclaims under 26 U.S.C. § 7302 in the cases covered by Silbert et al. v. United States, supra. Later, the Government withdrew those counterclaims and filed libels in Civil Nos. 19504,

violating the provisions of the internal revenue laws, * * * and no property rights shall exist in any such property.

Whether *Marchetti* and *Grosso* require a holding proscribing the Government's use of the statutory forfeiture penalty procedure provided by 26 U.S.C. § 7302 against a person who has exercised his Fifth Amendment privilege against self-incrimination, is admittedly a close question—one upon which the two Circuit Courts of Appeal which have considered this question have disagreed. In United States v. One 1965 Buick, et al. and Wilbur Dean and Delores Dean, 392 F.2d 672 (6th Cir., April 17, 1968), the Sixth Circuit reached the conclusion that *Marchetti* and *Grosso* required no such result—that the Supreme Court in those cases had expressly stated that the federal wagering tax laws were not unconstitutional. The Sixth Circuit (at 680), cited United States v. United States Coin & Currency in the Amount of $8,674.00, 379 F.2d 946 (7th Cir. 1967). In that case, involving property seized belonging to one Angelini, the Seventh Circuit had originally decided in favor of the Government and against Angelini, resting its decision upon *Kahriger* and *Lewis*. After it handed down its opinions in *Marchetti* and *Grosso*, the Supreme Court granted certiorari in *Angelini*, vacated the Seventh Circuit's judgment therein, and remanded the case to the Seventh Circuit. 390 U.S. 204, 88 S.Ct. 899, 19 L.Ed.2d 1035 (1968). The Seventh Circuit, in a *per curiam* opinion, 393 F.2d 499, 500 (7th Cir., April 9, 1968), wrote:

> * * * In *Marchetti*, the Court concluded with this admonition (390 U.S. at p. 61, 88 S.Ct. at p. 709):
>
> > "We emphasize that we do not hold that these wagering tax provisions [26 U.S.C. §§ 4411 and 4412] are as such constitutionally impermissible; we hold only that those who properly assert the constitutional privilege as

to these provisions may not be *criminally* punished for failure to comply with their requirements." (Emphasis supplied.)

Because this is not a criminal case in which an individual's liberty is at stake, there is a question as to whether *Marchetti* is applicable.

The respondent monies were declared forfeit pursuant to 26 U.S.C. § 7302, which provides that "no property rights shall exist in * * * property" used "in violating the provisions of the internal revenue laws." The only provisions of the internal revenue laws which can support forfeiture here are 26 U.S.C. §§ 4411 and 4412. [footnote omitted].

*Marchetti* holds that compliance with §§ 4411 and 4412 subjects the taxpayer to

> " 'real and appreciable,' and not merely 'imaginary and unsubstantial,' hazards of self-incrimination" (390 U.S. at p. 48, 88 S.Ct. at p. 702).

Claimant Angelini would have subjected himself to exactly the same hazards by complying. In this respect, *Marchetti* and this case are the same. But the consequences of noncompliance are not the same in the two cases. The prospect of a felony conviction involved in *Marchetti* of course has a greater coercive effect than the possible loss of money involved herein. On the other hand, the prospect of losing in excess of $8,000 has a substantial coercive effect. In this respect, the landmark case of Boyd v. United States, 116 U.S. 616, 65 S.Ct. 524, 29 L.Ed. 746, is controlling. *Boyd* was a civil forfeiture action in which the claimant was given a choice between producing a possibly incriminating document and forfeiting the property. The Court held that such a choice was impermissible under the

19505, 19512, 19513 and 19514. The Government also at one time advanced "instrumentalities of the crime" and "derivative contraband" contentions in addition to its 26 U.S.C. § 7302 claims. All such arguments, other than the Section 7302 contention, and other than the *per se* contraband contention, have been dropped by the Government.

Fourth and Fifth Amendments. See Garrity v. State of New Jersey, 385 U.S. 493, 496–497, 87 S.Ct. 616, 17 L.Ed. 2d 562, which reaffirms and follows Boyd.

The only apparent purpose of 26 U.S.C. § 7302, as applied here, is to punish violators of Sections 4411 and 4412 of the Internal Revenue Code by taking away money used in committing the violations. See One 1958 Plymouth Sedan v. Com. of Pennsylvania, 380 U.S. 693, 700, 85 S.Ct. 1246, 14 L.Ed.2d 170. As a practical matter, *Marchetti* means that such violations are no longer punishable directly. It follows that they should not be punished indirectly through forfeiture.

In United States v. $125,882 in U. S. Currency, 286 F.Supp. 643 (S.D.N.Y. May 7, 1968), Judge Tyler cited and followed the post *Marchetti-Grosso per curiam* opinion in *Angelini*. Without citation of or reference to *Dean*, he held that the Government could not prevail in its libel action under 26 U.S.C. § 7302.

In a footnote at the end of his opinion Judge Tyler wrote:

> In One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), the Supreme Court drew a dichotomy between "derivative contraband" and "per se contraband". United States currency falls within the former classification. Thus, unlike heroin, it may be returned on a showing such as the one described hereinabove. [286 F.Supp. supra, at 643, n. 5].

Thus, Judge Tyler apparently refused to permit the Government to retain as derivative contraband any money seized from a person who had asserted his Fifth Amendment privilege not to incriminate himself.

On July 19, 1968, 397 F.2d 782, the Sixth Circuit denied a petition for rehearing in the *Dean* case. Noting that that petition was grounded upon *Angelini*, Chief Judge Weick wrote:

We consider *Grosso* and *Marchetti* in a different "light" than did the Seventh Circuit. As we pointed out in our opinion, the Supreme Court limited its holding to criminal cases. The Court approved its previous decisions in License Tax Cases, 72 U.S. 462 (5 Wall), 18 L.Ed. 497 (1866), and United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927), which upheld the power of Congress to tax unlawful activities. It is not for us to extend *Grosso* and *Marchetti* to civil cases and thereby exempt from taxation persons who derive their income from unlawful activities because they assert their Fifth Amendment rights in a criminal case. There is such a thing as an obligation to pay the excise tax. Even though such a person may not be convicted for criminal violation, because of exclusionary rules of evidence, he still remains civilly liable for the tax.

The statute (26 U.S.C. § 7302) makes it unlawful to have or possess any property intended for use in violating the internal revenue laws, and no property rights exist in such property. The forfeiture action is in rem against the property so used. Various Items of Personal Property v. United States, 282 U.S. 577, 51 S.Ct. 282, 75 L.Ed. 558 (1931). \* \* \*

\*     \*     \*     \*     \*     \*

\*     \*     \*     \*     \*     \*

We do not regard One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania, 380 U.S. 693, 85 S.Ct. 1246 (1965), as apposite. It involved a search without a warrant which the state court determined was without probable cause. The forfeiture there depended upon the admission of illegally obtained evidence in violation of the Fourth Amendment as applied to the state by the Fourteenth Amendment. In the present case, the arrest was lawful and the search was pursuant to the authority of warrants which we have held to be valid. No illegally obtained evidence was admitted in the forfeiture proceeding. It is not necessary that there be a criminal conviction in order

to support the forfeiture. Various Items of Personal Property v. United States, supra; cf. Murphy v. United States, 272 U.S. 630, 47 S.Ct. 218, 71 L.Ed. 446 (1926).

In any event, the property forfeited was found to be contraband and appellants are not entitled to have it returned to them. United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948); United States v. One Ford Coupe, 272 U.S. 321, 47 S.Ct. 154, 71 L.Ed. 279 (1926); United States v. Deane Hill Country Club, Inc., 342 F.2d 794 (6th Cir.), cert. denied, 381 U.S. 937, 85 S.Ct. 1769, 14 L.Ed.2d 701 (1965); United States v. $1,058.00 in United States Currency, 323 F.2d 211 (3rd Cir. 1963). * * *

This Court can add little to what has been written on this issue by the Sixth and Seventh Circuits and by Judge Tyler. This Court is, however, persuaded by the reasoning in the post-*Marchetti-Grosso per curiam* opinion in *Angelini*, and is of the opinion that the latter correctly interprets the thrust and breadth of *Marchetti* and *Grosso*.[7]

■■ In the cases at bar, the property seized apparently included certain gambling paraphernalia. One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania, 380 U.S. 693, 699, 85 S.Ct. 1246 (1965), distinguishes between "per se contraband" i. e. property which cannot legally be possessed, and "derivative contraband," such as an automobile or money. Property which is *per se* contraband should not be returned and should ultimately be destroyed by the Marshal. United States v. Jeffers, 342 U.S. 48, 54, 72 S.Ct. 93 (1951) (narcotics); Trupiano v. United States, 334

U.S. 699, 710, 68 S.Ct. 1229 (1948) (unregistered still, alcohol and mash); United States v. Blank, 261 F.Supp. 180, 184 (N.D.Ohio 1966) (gambling paraphernalia).[8] Clearly, any gambling paraphernalia seized in any of the raids in the cases covered by this opinion should not be returned and should be retained by the Government.

The Government contends that in *Silbert, Salsbury* and *Bondroff*, valid income tax levies have been laid on certain of the property seized in the raids in these cases. The Government further asserts that the private litigants may not challenge, in a criminal case or in any of the proceedings pending in this Court, the validity of such levies.

In Welsh v. United States, 95 U.S. App.D.C. 93, 220 F.2d 200 (1955), the question was presented whether the defendant in a criminal case could require the return of money illegally seized from him in view of the assertion by the Government of a lien on the money for taxes. The defendant contended that the Fourth Amendment precluded the attachment of the lien to the money. The Court, disagreeing, wrote (at 202):

That Amendment prohibits the violation of the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure." This right is primarily safeguarded by suppressing the evidence secured as a result of the violation when it is tendered in a Federal court. McDonald v. United States, 1948, 335 U.S. 451, 453, 69 S.Ct. 191, 93 L.Ed. 153. But here the money has been declared illegally seized and has been suppressed as evidence. To subject it to a tax lien does not result in using the money as evidence in any proceeding, criminal or Civil. The

---

7. There is, thus, no need for this Court to consider the contention of the private litigants that the Government, having levied for tax purposes upon certain of the funds involved, thereby cut off its right to claim forfeiture under 26 U.S.C. § 7302. The Government urges the opposing position that the property involved

was forfeited to the Government when such property was used.

8. "The return of the contraband would clearly [frustrate] the express public policy against the possession of such objects." One 1958 Plymouth Sedan v. Commonwealth of Pennsylvania, supra, 380 U.S. at 699, 85 S.Ct. at 1250.

money is being held as security for an asserted tax debt—not arising out of the illegal seizure or, so far as appears, out of information gained from the seized money—pending determination of the debt and lien in an appropriate proceeding.

In Field v. United States, 263 F.2d 758 (5th Cir. 1959), despite the fact that the seizure was admittedly unlawful, the Fifth Circuit concluded that the levy was still valid, stating (at 763):

> The citizen owes his tax to the sovereign. The citizen's property may be seized by levy to satisfy that tax. As long as it is his property, unencumbered by a lien having tax priority, the levy follows the property into the hands of whomsoever it might fall.

In Simpson v. Thomas, 271 F.2d 450 (4th Cir. 1959), Chief Judge Haynsworth cited *Field*, supra, and *Welsh*, supra, with apparent approval, and observed (at 452):

> There are appropriate procedures by which the taxpayers here, if they dispute the claim that they owed taxes in the amounts collected, may contest them. These proceedings are not appropriate for that purpose.[9]

In Schreck v. United States, Civil No. 19577 in this Court, challenges are made by the private litigant concerning the tax assessment, tax levy and tax lien therein. Those attacks may or may not be relevant in one or more of the cases covered by this opinion. Counsel for Schreck has recently filed a lengthy memorandum in support of his client's position. The Government has requested time to respond. This Court will delay final ruling upon the tax assessment questions raised in one or more of the cases covered by this opinion until after a hearing in the *Schreck* case, of which counsel for the parties in these cases will be notified and given the opportunity to participate, if they so desire.

This Court hereby orders the return, to the respective persons from whom the same were seized, of all property other than *per se* contraband, and other than property upon which the Government has levied in pursuance of assessments. The Government is hereby requested to submit an Order listing all gambling paraphernalia and setting forth the time and the conditions at and under which the Marshal of this Court will be instructed to destroy the same. The motions to dismiss filed by the intervening claimants in the libel cases covered by this opinion are hereby granted. The motions to dismiss filed by the Government in the other cases covered by this opinion will be ruled upon finally after the tax assessment issues have been determined.

9. See also Jules Hairstylists of Maryland v. United States, 268 F.Supp. 511 (D.Md. 1967), aff'd. per curiam by the Fourth Circuit on January 12, 1968, 389 F.2d 389.